We have four cases on the calendar this morning, two government employee cases, one of which is being submitted in the briefs and will therefore not be argued, a patent case, a vaccine case from the Court of Federal Claims, and our first case is a government employee case, Daniel Yasudian v. Environmental Protection Agency, 2009-3175. Mr. Deeds. Good morning and may it please the Court. I'm Michael Deeds on behalf of the petitioner, Mr. Yasudian. This case comes before the Court on a petition for review of a Merit Systems Protection Board order upholding the removal of Mr. Yasudian from Federal Service, specifically Mr. Yasudian was a GS-13 program analyst with the Environmental Protection Agency. He had a tenure of, I believe it was approximately six years, and he was removed by the agency under Chapter 43 of 5 U.S. Code in February of 2008. He was removed for alleged unacceptable performance. Chapter 43 of 5 U.S. Code provides that whenever an employee's performance falls to the unacceptable. What was the mistake you think was made by the board? The mistake that was made, I think, by the board was that there was not substantial evidence that the agency provide Mr. Yasudian a reasonable and bona fide opportunity to improve himself once the agency. They gave him a PIP period. He didn't meet the standards. What's the failure here? Well, the problem with the PIP period is that the agency, is that during the PIP period, the supervisor of Mr. Yasudian substantially increased the workload of Mr. Yasudian. That's by full admission of the supervisor, and it's at the Joint Appendix 1086. Did you say about the funding histories now? Is this the funding histories issue? That's correct, Your Honor. It went from 4 to 14? Well, by way of background, I should start out by saying that as a normal part of Mr. Yasudian's duties, he would be called on to do these types of funding histories maybe once a year. The supervisor testified during the administrative hearing that he had done two in two years. Here, he's being called upon to do 14 in a 28-day work period. The supervisor estimated that this would be, that for each funding history that had to be done during the 28-day work period, that would be an additional at least four hours of work. Now, of course, Mr. Yasudian doesn't... So the funding, doing funding histories was, I think there's evidence in the record that it was part of his normal duties, but that you're saying the number, the problem here was that the number of them was greatly increased. Is that the issue? Greatly increased, I mean, by, from one during, over the course of a year, and that was done not just by Mr. Yasudian himself, but by other members of the team to 14 in, as I said, in a 28-day period. The record shows that the rest of his workload was decreased to allow him to do this. That's not true, Your Honor. That question was specifically asked of the supervisor during the administrative hearing. It was specifically asked whether there was any accommodation made... I'm sorry. First of all, he was asked whether Mr. Yasudian was required to perform these funding histories in addition to his, quote, full normal workload. The answer to that question at the Joint Appendix 1086 is yes. He was then asked by counsel for Mr. Yasudian whether there was any accommodation made with regard to Mr. Yasudian's normal workload in order that he could perform these 14 additional funding histories during the performance improvement period. The answer to that was no. So there's no question that there were, by the supervisor's own admission, there's no question that this work was piled on during the performance improvement period, and it's, so it's, and it's effectively an additional two hours of to do one of these. Fourteen of them will take a week then, and he had 60 days. Fourteen of them would take 56 hours, and what we're arguing is that... If I were in a pip, I'd work 56 hours a week and do them in one week, wouldn't I? Well, Your Honor, the point of the point is... But I still have 60 days, and he didn't get it done. I'm struggling to find the problem here. No, he only had, he only had 28 days according to the testimony, Mr. Fontaine. They had to be turned in by the 14th, and the testimony varies here, but for purposes of the finding, the administrative judge found that he did not turn them in by December 14th. I think I've lost track of your original question. Well, but my original question, it's only four hours to do one. He could do 14 without stressing? Well, you understand, Your Honor, this is on top of a normal workload of 40 hours per week. I mean, you can't, and so our, the point is that you can't use the performance improvement period, and we rely on a merit systems board case here, which indicates that agencies may not use a PIP either to reduce or increase the standards of performance established at the beginning of the appraisal period. Our point here is that you've effectively increased the standards. You're effectively asking the employee to produce much more than he had been required to do in the past, and that he had been rated, and the standard under which he... Excuse me, what exactly is involved in putting together a funding history? What does one have to do? The main part of it is essentially research, researching the funding per year of these various 14 funds that he was assigned. Now, some of these funds go back decades. When you say different funds, different accounts, really? That's right, and some of these, because some of these programs have been around for decades, and Mr. Yusudin was assigned to figure out the funding histories for the entirety of the fund, he was therefore required to research this going back decades. I should also point out, I go in research, he was in a different building altogether, so he had to go to a different building in order to... When you talk about the history, you're talking about he has to go and see what figures were allocated to each account or each fund going back a certain period of time, is that what it is? That's correct, Your Honor, and obviously, once you've found that, you have to put them in a chart form, and I believe there was other coalition that was involved in that as well. But our point is that you can't... This is effectively an increase in the standards. You're effectively asking an employee to do much more than he'd been required to do, and you can't use a performance improvement period in order to do that. The second argument that we make is that there was no... The agency has a duty that's established under Chapter 43 and under the Ivo case that this court decided, that it has to be very clear and objective in terms of the performance standards that it provides. Our argument, our second argument, is that the as to the deadline. There are... There was some... Certainly, the record shows there was some uncertainty at the start as to the precise ending date, but didn't that really all get sorted out in the end? I mean, so that there was, in fact, 60 days? That's actually a slightly different argument. That's our third argument, not providing 60 days, and I guess I categorize them that way. But there was... The confusion remained until the end because the testimony was that suddenly Mr. Fontaine calls Mr. Yossoudian, or I can't remember if it was a call or an email, and says, your time's up. You've got to bring in your documents. And lo and behold, Mr. Yossoudian had believed that the document... I'm sorry, the assignment was due on January 9th. So there was certainly confusion. And I think if you look at the document itself, there are certainly at least three possible dates. I mean, there's the December 31st date that the supervisor marks down. But if you read the document as well, the document indicates that the assignment is due 60 days after the beginning of the PIP period. Now, that provides two additional dates because does the PIP period begin the first time Mr. Yossoudian got an incomplete document on November 2nd, or does it begin on November 5th? The other thing I would point out is that the particular task, which is task one, is not given any particular due date. If you look through it, task two is given a due date of December 14th, but task one is never given any due date. And I think that, again, lends itself to the idea that the standards that the supervisor set forth were not clear and could have been clear because there's no more objective standard than putting a deadline on when a project is due. I'll reserve the rest of my time for that. May it please the Court, the Court should affirm the decision below because substantial evidence supports the Board's conclusion that Mr. Yossoudian was provided a reasonable period within which to improve his performance. But they gave him an extra amount of work, didn't they? No, they did not give him an extra amount of work, Your Honor, with all due respect. The preparation of the 14 funding histories... That was a question, not a conclusion. Okay. First, the preparation of the 14 funding histories had begun in the summer of 2007. At that point, during the PIP that was found to be procedurally deficient, Mr. Fontaine had assigned Mr. Yossoudian to identify the key elements of the programs covered by their office, the water programs, and then create funding histories for each of those. Well, Mr. Yossoudian had trouble handling that assignment and finally just ended up starting for funding histories. So when they entered into the PIP that began in November of 2007, Mr. Fontaine actually made the work easier because he said, look, I'm not going to ask you to identify the key elements. I'm going to give you 14 programs. All you have to do is create the funding histories. And he gave them programs that were easier to prepare the funding histories than other ones. He actually made the decision that he would find ones that would be manageable. In addition, with respect to Mr. Yossoudian's claim that Mr. Fontaine at the hearing admitted that the foreign funding histories were on top of his normal workload and basically piled on, if you look at that statement in the context of the whole record, you'll see that it was taken out of context. All throughout his tenure in the Office of Water Programs, Mr. Yossoudian had routine, everyday tasks that he was expected to perform. In addition to that, he had intermittent projects that he was expected to take on and handle within his normal work week. And there are examples of that in the record. If you look at pages 352 and 353, you see that in 2005 he was, in order to brief a new executive director, he was supposed to provide, prepare not only budget histories for just about, for many programs in the office, but he was also supposed to analyze it. Mr. Osborne, one question. Looking at his normal duties before the performance improvement period or the period before that, when it was a test period, I guess, what, in a year, and under his normal duties, how many of these funding histories would he have to perform? He had never been assigned to routinely create the funding histories from scratch. However, he had routinely updated the funding histories. So here, all he was doing was taking programs that didn't have funding histories before and making funding histories. And if you look at pages 298 and 299 of the record, you can see examples of these funding histories. I'm not trying to minimize the amount of work that was involved, but they're one-page charts. And basically, what Mr. Yossoudian had to do was go to books, mostly that were in his own office. As Mr. Deeds mentioned, there were certain instances where they had to go to the next building over, but he was just taking numbers from a voluminous amount of books and creating charts. This was clearly within his performance standards. Mr. Deeds isn't even saying that it isn't anymore. And it was something that could be done at a time allotted to him. Mr. Fontaine testified that four hours would be a reasonable time within which to perform this work, and he was given six weeks to complete it. Now, what else did he have to do during that period? What other kinds of things? Well, his PIP also required him to maintain a budget binder and a flyaway binder. Now, I would note, Judge Rader mentioned, was this a decrease in his workload? Earlier in the year, when he was under a performance assistance plan, one of his assignments had been to create the flyaway binder from scratch, which was quite a bit of work. So, by the time his November 2007 PIP came along, all he was doing was updating that binder. So, as you can see, his work was in flux throughout his tenure there, and these funding histories, under no set of circumstances, were more than he would otherwise have been required to perform. In addition, unless the Court has other questions about that, I'll move on to the whole date issue. Mr. Yossoudian has claimed that the length of his PIP did not satisfy the requirements of the collective bargaining agreement. However, the collective bargaining agreement specified 60 days. The PIP itself, the memorandum memorializing the PIP, stated twice that the PIP would last 60 days. And when all was said and done, Mr. Yossoudian was provided 60 days to do the work. Notwithstanding that, he missed the deadline for the Task 2 funding histories by a couple of weeks, and he also missed the deadline for the budget and flyaway binders. Now, we recognize that the memorandum memorializing the PIP did say December 31st, but that error, to the extent it was an error, was corrected because Mr. Shapiro, the deciding official, took into account that Mr. Yossoudian was entitled to two extra days to finish his assignments. Mr. Yossoudian claims that he wasn't given adequate instructions or that there was confusion, but he concedes twice that the memo said that the PIP was for 60 days. And he was not left to guess. I mean, board decisions, which I know are not binding on this Court but can be considered, have established that if, for the sake of argument, there was any confusion, then Mr. Yossoudian could have asked and said, well, when is the deadline, or said, I can't meet this deadline, I need more time. He did none of that. Mr. Deeds also said that with respect to Task 1, Mr. Yossoudian was not given a particular due date, but the PIP was 60 days, and December 31st was the deadline put in the PIP, and he wasn't given an interim deadline on that task. So there's no basis to say that there was never a deadline. Also, Mr. Yossoudian had claimed that the agency relied chiefly on lateness for his removal, but that's not true. Lateness was clearly one of the problems he was experiencing, but he also had numerous errors in his Task 1 budget and fly-away binders, notwithstanding the fact that he didn't turn them in until after the due date. So having covered the issues that were covered by Mr. Deeds, unless the Court has further questions, I would ask that the Court affirm the decision below. Thank you, Ms. Hossford. Mr. Deeds has some rebuttal comments. Now, Ms. Hossford said he really wasn't given more work. I'm sorry, I didn't hear your question. Your opponent says he really wasn't given more work, all told. I understand she said that. But isn't her statement, and back up for it, doesn't that constitute substantial evidence, even if reasonable people could differ on it? I don't think so, Your Honor, because the supervisor very clearly admits that he was given extra work. So I don't see how, with this admission, I don't see how a reasonable person could find that he was. When you say extra work, is it more funding histories than he had normally, or in total his work was greater than it would be during a regular employment period? That's right, in total. And the point that we're making is that, and actually I think the opposing counsel basically affirmed this, was that he typically was not required to provide these funding histories from scratch. But work fluctuates up and down always. The question is whether this was so much additional work that it really made it impossible for him to succeed in his PIP. And there's certainly no admission to that extent, is there? I don't think that's the standard, Your Honor, whether it's impossible or not. Well, it's a piling on standard, and we find no admission of piling on. To the contrary, we find findings by the administrative judge below that the standards were reasonable and not achieved. Well, the question is whether a piling on of work... Piling on is not just additional work, is my point. Piling on is more than additional work. It is a significant inhibiting factor. Right. I mean, such that it does not allow for an employee to have a reasonable and bona fide opportunity to improve himself. Exactly. And what you find here is a finding that he received that reasonable opportunity and didn't achieve it. And I think our counterargument to that is that under this, that can't possibly be the case. Because under the standards of the Betters case that we heavily rely upon, you can't change the standards. You can't change them basically at all. I mean, you certainly can't substantially change them the way that we argue that they were changed in this case. I mean, at some point, at least, our argument is at some point, at least, you've given the employee so much work that you've basically set him up to fail. And you've not given him a reasonable opportunity because he can't... Well, you've changed the standards of the position, but he can't get the work done. So I think that is essentially our argument. Just one final point with regard to the 60 days. I think the 60 days all depends on how you count it. I mean, in other words, when did the performance improvement period start? And I don't think the administrative judge or the agency has ever made clear exactly when the PIP ended and when it began. Well, he was given the notice on November 2nd, and it said right on there, 60 days. Right? That's correct. So, I mean, you could calculate 60 days, and even if it isn't exactly December 31st, you still know it's the next day, right? Well, but that depends, Your Honor. I mean, there's two other factors in that. I mean, one is that there... 60 days is 60 days. It's pretty clear. Yeah, but the question is when the 60 days begin. I mean, does it begin on November 2nd or does it begin on November 5th when an amended document is given to Mr. Yossoudi? But the amended document says December 31st. Well, the amended document says December 31st. I mean, there isn't any ambiguity in the amended document. There is. So the best you can get is January 1st, one more day. No, there is ambiguity in the second document because the second document also says that it's 60 days from the date of receipt of this document. So that would not be December 31st. And he turns his material in then even under that a couple days late, right? Well, he turns in one task on January 3rd and the other on January 7th. Unless there are other questions, I have nothing further, Your Honor. Thank you, Mr. Deeds. The case will be taken under advisement.